# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RICHARD SOLAND,** | |
| Plaintiff, | |
| v. | Case No. 10-cv-02034 (CRC) |
| **THE GEORGE WASHINGTON UNIVERSITY, et al.,** | |
| Defendants. | |

## MEMORANDUM OPINION

In this ERISA case, former George Washington University ("GW") Professor Richard Soland alleges that the university breached a fiduciary duty by failing to inform him of a department-wide retirement plan that he claims was in the works while he was negotiating his retirement. GW's omission, Soland contends, caused him to agree to a less-beneficial retirement package. GW disputes that the alternative plan was in development when the parties negotiated Soland's retirement and has moved for summary judgment. Because Soland has not offered evidence establishing that GW made a misstatement or failed to disclose necessary information, and because the plan was in too nascent a stage to constitute material information when Soland sought to retire, the Court will grant GW's motion.

### I. Background

For nearly thirty years, Soland was a professor at GW's School of Engineering and Applied Science ("SEAS"). Am. Compl. ¶ 7. In 2005, he began considering retirement and discussed it with the chair of his department, Dr. Thomas Mazzuchi. Pl.'s Opp. to Mot. for Summ. J. Ex. 1, Deposition of Richard Soland ("Soland Dep.") at 11:22–13:4. These conversations led to his appointment as the special assistant to Timothy Tong, the SEAS Dean.

1

Id. at 14:3–13.  In November 2007, GW announced that Dean Tong would step down the next year and be replaced by David Dolling.  Am. Compl. ¶¶ 10,  Soland reiterated his interest in retiring to Mazzuchi.  Id. at 14.  Soland contends that Richard Cosentino, another employee of SEAS, encouraged him to pursue retirement while he could leverage his relationship with Tong before the dean left.  Soland Dep. at 17:1–18:16.  On January 31, 2008, Mazzuchi sent Soland an individual separation agreement detailing the terms of Soland's retirement from SEAS.  Def.'s Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. ¶ 9.  Dr. Donald Lehman, GW's chief academic officer, approved Soland's retirement agreement on April 7, 2008.  Id. ¶ 11.  Under the agreement, Soland continued work through the end of the Fall 2008 semester, took administrative leave with full pay for the 2009 calendar year, and then was awarded emeritus status.  Id. ¶¶ 14–16.

According to Soland, around the time of his departure, Lehman and Tong were participating in what was called the "SEAS 2020 Commission," a committee of professors and administrators charged with developing "a set of concrete recommendations" to improve academic performance and finances.  Pl.'s Statement of Disputed Material Facts in Opp. to Mot. for Summ. J. ¶¶ 16–18.  The 2020 Commission issued an 85-page report in April 2008.  The report included a paragraph titled "Encourage research-inactive professors nearing retirement to leave," which recommended that "inactive professors should be entitled to retire early."  Pl.'s Opp. to Mot. for Summ. J. Ex. 3, Deposition of Donald Lehman ("Lehman Dep.") Ex 3.  An earlier draft of the report had suggested that faculty members who were not actively conducting research should be encouraged to leave "with perhaps a buy-out plan."  Pl.'s Opp. to Mot. for Summ. J. Ex. 4, Deposition of David Dolling ("Dolling Dep.") Ex 3.  Lehman testified in his deposition that he may have heard about the 2020 Commission's recommendations during

committee meetings in late 2007. Lehman Dep. 30:14–31:13. Dolling also indicated in an email that he had discussed how to pay for a voluntary separation plan with GW's president during his recruitment as SEAS dean. Dolling Dep. Ex. 1. In July 2008, after Soland's retirement was finalized, Lehman listed "develop[ing] a voluntary separation plan" as a goal in his yearly performance evaluation. Id. Ex. 7.

On October 23, 2009, eighteen months after Soland's separation agreement, Lehman notified the faculty that SEAS would adopt a Voluntary Separation Incentive Plan ("VSIP") for full-time faculty employed more than 15 years. Am. Compl. ¶ 18. Soland wrote a letter to Lehman in December 2009 claiming he was eligible for the VSIP. Id. ¶ 22. Lehman responded that Soland did not qualify for the plan because Soland's "full-time active status" with SEAS ended at the conclusion of the Fall 2008 semester. Id. Undaunted, Soland applied for the VSIP, but Lehman denied his request and his subsequent appeal. Id. ¶¶ 17, 23–25.

Soland then brought this suit against GW, the George Washington University School of Engineering and Applied Science Voluntary Separation Incentive Plan, the George Washington University Office of the Executive Vice President for Academic Affairs, and Lehman, alleging breach of fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 and common law negligent representation. He also claimed that he was owed benefits under the new VSIP. Judge Wilkins, who previously oversaw this case, dismissed Soland's negligent representation claim and granted summary judgment in favor of GW on his claim for benefits. After the close of discovery, GW moved for summary judgment on Soland's remaining claims, arguing that it was not in a fiduciary relationship with Soland when it negotiated his retirement agreement and, even if it was, Soland had put forth no evidence to demonstrate that GW misrepresented the existence of the VSIP. Def.'s Mot. for Summ. J. at 1.

3

## II. Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the burden to demonstrate "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To overcome a motion for summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." Id. at 324 (quotation omitted). A dispute is genuine only if a reasonable fact-finder could find for the non-moving party; a fact is only material if it is capable of affecting the outcome of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Laningham v. Dep't of the Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." Scott v. Harris, 550 U.S. 372, 378 (2007) (quotation and brackets omitted).

## III. Analysis

To prevail on his claim, Soland must ultimately prove (1) that GW and the other defendants owed fiduciary duties to him under ERISA; (2) that they made a misstatement or misleadingly omitted information—thereby triggering a duty of disclosure; and (3) that any misstatement or omission was material to his decision to retire. See Eddy v. Colonial Life Ins. Co., 919 F.2d 747, 750 (D.C. Cir. 1990). Because the Court finds that GW made no misstatement or misleading omission and that the information allegedly withheld from Soland during negotiations was not material, it need not decide whether GW had a fiduciary relationship with Soland at the time of the negotiations.

A. <u>Misstatement and Disclosure</u>

An ERISA fiduciary breaches its duty to act "solely in the interest of [plan] participants and beneficiaries" by deceiving beneficiaries in order to save the employer money at the beneficiaries' expense. <u>Mullins v.Pfizer, Inc.</u>, 147 F. Supp. at 107. Put another way, "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA[.]" <u>Varity Corp. v. Howe</u>, 516 U.S. 489, 506 (1996). ERISA does not impose a duty to disclose future changes to plans prior to their formal adoption unless a beneficiary has made a specific inquiry or the fiduciary has made a statement about future plans that would be misleading absent further disclosure. See <u>Bins v. Exxon Co. U.S.A.</u>, 220 F.3d 1042, 1045 (9th Cir. 2000) (rejecting duty to "volunteer information [about retirement plan changes being seriously considered]. . . in the absence of specific questions"); <u>Chojnacki v. Georgia-Pac. Corp.</u>, 108 F.3d 810, 817 (7th Cir. 1997) ("mere passive behavior" cannot give rise to a breach of fiduciary duty claim under ERISA unless it is misleading); <u>Pocchia v. NYNEX Corp.</u>, 81 F.3d 275, 278 (2d Cir. 1996) ("a fiduciary is not required to voluntarily disclose changes in a benefit plan before they are adopted"). Thus, GW can only be liable if it made a misstatement or if a specific inquiry by Soland triggered a duty to disclose information in order to avoid a misleading omission.

Soland does not point to any explicit statement by GW that was false or misleading. Neither does he claim that he specifically asked GW whether SEAS planned to offer a retirement incentive plan. Instead, he argues that by signaling his interest in learning what retirement options were available, he triggered a duty on the part of GW to disclose all pertinent retirement options covered by ERISA, including any anticipated future plans. Opp. to Mot. for Summ. J. at

11–12. He also argues that Cosentino's advice that he retire while Tong was still the dean of SEAS triggered a disclosure obligation. Id. at 11.

Soland argues that this disclosure obligation arises under Eddy v. Colonial Life Insurance Co., 919 F.2d at 747. Unlike here, however, Eddy involved a misrepresentation by the employer. The plaintiff in Eddy inquired about whether he could continue his health insurance when his employer switched plans. The employer responded "no" because, literally speaking, the employer could not have "continued" his plan; he would have had to "convert" his existing plan into a new plan. Id. The D.C. Circuit concluded that after the plaintiff told his employer that his coverage was ending and asked about potential options for maintaining coverage, the employer "bore a fiduciary duty to convey correct and complete information material to [the plaintiff's] circumstance." Id. at 751. The facts here are different. Soland merely expressed general interest in retiring; he did not inquire about whether new retirement plan options might arise in the future. The Court declines to extend Eddy's holding that employers have a duty not to mislead employees once an inquiry about the availability of future benefits is made by instead imposing a general duty to disclose plan changes prior to formal adoption.

Cosentino's statement to Soland likewise did not trigger a duty to disclose because, even if attributable to GW, it was not a misstatement and did not misconstrue Soland's retirement options. According to Soland, Cosentino suggested that Soland might be able to secure a buy-out agreement before Dean Tong retired because of their amicable relationship. Soland Dep. at 18:11–16. There is nothing false or misleading about this statement, which appears to be no more than a shared thought between colleagues. By contrast, in Mathews v. Chevron Corp., 362 F.3d 1172 (9th Cir. 2004)—which Soland attempts to analogize to this case—a plant supervisor repeatedly told his employees that there would not be layoffs and an accompanying severance

6

plan while, at the very same time, the supervisor was being pressured by management to adopt just such a plan, which he eventually did. Id. at 1178–79. Unlike Cosentino's advice, the supervisor in Mathews knew that his statements were false and those statements directly implicated future benefits. Here, Soland offers no evidence that Cosentino's statement was an intentional or reckless act designed to persuade Soland to retire, and there is no indication from the record that Cosentino knew of a plan to implement a SEAS-wide retirement incentive offer in the future.[1] Because Soland does not point to any affirmative misstatement by GW, and did not specifically inquire about future retirement plan options, and because Cosentino's general advice was not misleading, no disclosure duty arose.

### B. Materiality

The Court next considers whether GW was obligated to disclose the existence of the VSIP plan when Soland negotiated his retirement. The parties propose alternative tests for determining whether such an obligation existed, each of which has been adopted by some of the circuits. The D.C. Circuit appears not to have spoken on the matter. GW argues that the appropriate inquiry is whether the VSIP was under "serious consideration" when Soland negotiated his retirement. Soland contends that the test is whether a reasonable person would have found the withheld information material in deciding whether to retire. Under either proposed test, there is no evidence from which a reasonable jury could conclude that GW

---

[1] Lehman states that Cosentino had attended some of the meetings of the 2020 Commission, Lehman Dep. at 25:7–14, but this does not demonstrate that Cosentino knew of the recommendation that "professors should be entitled to retire early," which was not published until well after Cosentino made the alleged statement to Soland. And it certainly does not demonstrate that Cosentino knew that the school planned on creating the VSIP, as the statement in the 2020 Commission report was a single-line recommendation without any detail or indication of future plans. As discussed further below, this lone reference is insufficient to establish the existence of a plan for a future buy-out.

7

breached a duty of disclosure because the VSIP was in too nascent a stage when Soland negotiated his retirement.

*i. Serious Consideration Test*

The serious consideration test, which was first developed by the Third Circuit, establishes that a plan must be disclosed upon inquiry if "(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." Fischer v. Phila. Elec. Co., 96 F.3d 1533, 1539 (3d Cir. 1996). A majority of the circuits that have addressed this issue have adopted some form of this test. See Mathews, 362 F.3d at 1180–82; Beach v. Commonwealth Edison Co., 382 F.3d 656, 661 (7th Cir. 2004); McAuley v. IBM Corp., 165 F.3d 1038, 1043 (6th Cir. 1999); Hockett v. Sun Co., 109 F.3d 1515, 1523 (10th Cir. 1997); Vartanian v. Monsanto Co., 131 F.3d 264, 272 (1st Cir. 1997). If all three prongs of the serious consideration test are met, "details of the amendment become material; until then there is only speculation." Beach, 382 F.3d at 659.

The first element, a specific proposal, distinguishes serious consideration from "the antecedent steps of gathering information, developing strategies, and analyzing options." Fisher, 96 F.3d at 1539–40. The evidence Soland puts forth falls short of establishing that GW engaged in anything more than these types of preliminary activities. In 2007, a draft version of a portion of the 2020 Commission's report recommended that older SEAS professors should be encouraged to retire "with perhaps a buy-out." Dolling Dep. Ex 3. The final version excluded this phrase and simply recommended that inactive professors should be entitled to retire early. Lehman Dep. Ex. 3. This recommendation is so lacking in detail and analysis that it barely qualifies as "gathering information, developing strategies, and analyzing options," let alone constitutes a specific proposal. See Fisher, 96 F.3d at 1542 (finding that "a general discussion of

early retirement options" was not a specific proposal, while "a document outlin[ing] various early retirement alternatives" was sufficiently specific). Dolling's statement in an email that he had discussed whether SEAS or GW would pay for an incentive plan prior to his appointment as dean likewise falls short of a specific proposal. It merely shows that the SEAS administration was, at most, "developing strategies and analyzing options." See id. ("Senior management is free to start the process of exploration and evaluation without immediately triggering a duty of disclosure.").

The second element of the serious consideration test—whether a specific proposal is being discussed for the purpose of implementation—"turns to the practicalities of implementation." Peterson v. Am. Tel. & Tel. Co., 127 Fed. App'x 67, 72 (3d Cir. 2005) (citing Fisher, 96 F.3d at 1540). Again, Soland's evidence does not suggest that SEAS was working towards implementing a specific proposal when he was negotiating his individual separation agreement. The 2020 Commission report does not include any substantive discussion of the details or practicalities of a potential plan, such as what incentives to offer, how much to pay, and which professors should be eligible. It contains only a single-paragraph, general recommendation that senior staff should be "entitled to retire." See, e.g., Vartanian v. Monsanto Co., 956 F. Supp. 61, 66 (D. Mass. 1997), aff'd, 131 F.3d 264 (discussions for the purpose of implementation begin only "when authorized senior management were first taking a hard look at different forms of the potential new plan"). Such a general, undeveloped recommendation does not rise to a specific proposal.

> ## ii. Materiality Test

Two circuits have declined to adopt the Fisher bright-line test and instead ask "whether there is a substantial likelihood that a reasonable person in the plaintiffs' position would have

9

considered the information an employer-administrator allegedly misrepresented important information in making a decision to retire." Martinez v. Schlumberger, Ltd., 338 F.3d 407, 428 (5th Cir. 2003); accord Ballone v. Eastman Kodak Co., 109 F.3d 117, 124 (2d Cir. 1997). This rule applies only to *misrepresentations*; it does not create a general obligation to disclose future potential plan changes. Martinez, 338 F.3d at 429; Pocchia, 81 F.3d at 278–79.

These circuits apply several factors in determining whether there has been a material misstatement. One prominent factor relevant to materiality is the serious consideration test as outlined above: "the more seriously a plan is being considered, the more likely a representation about the plan is material." Martinez, 338 F.3d at 428; accord Ballone, 109 F.3d at 123. As discussed above, the VSIP was not under serious consideration when Soland was negotiating his retirement. This factor weighs heavily against a finding of materiality because, even if GW was under a duty to disclose expected future ERISA plans, Soland proffered no evidence demonstrating that a plan existed at the time he negotiated his retirement.

Other factors considered under the materiality test include "how significantly the statement misrepresents the present status of internal deliberations regarding future plan changes[;] . . . the special relationship of trust and confidence between the plan fiduciary and beneficiary[;] . . . whether the employee was aware of other information or statements from the company tending to minimize the importance of the misrepresentation or should have been so aware[;] . . . and the specificity of the assurance[.]" Ballone, 109 F.3d at 125; accord Martinez, 338 F.3d at 428. The first and last factors weigh heavily against Soland because, as explained above, GW did not make any statement that misrepresented whether it intended to offer a retirement incentive plan. Neither side has provided significant evidence showing a special relationship between the parties, so this factor is neutral. Because each factor weighs in favor of

finding there was no material misstatement by GW or is neutral, summary judgment in favor of GW is appropriate under the materiality test as well.

**IV. Conclusion**

For the reasons stated above, the Court will grant Defendants' motion for summary judgment. The Court will issue an order consistent with this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: ___July 25, 2014_____